# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACQUELINE B.,[1]<br>         **Plaintiff,**<br>v.<br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br>         **Defendant.** | NO. EDCV 18-0104-KS<br><br>MEMORANDUM OPINION AND ORDER |

## INTRODUCTION

Plaintiff filed a Complaint on January 17, 2018, seeking review of the denial of her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. (Dkt. No. 1.) The parties have consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 11-13.) On September 26, 2018, the parties filed a Joint Stipulation. (Dkt. No. 19 ("Joint Stip.").) Plaintiff seeks an order reversing the Commissioner's decision and remanding the matter for further proceedings. (Joint Stip. at 18.) The Commissioner requests that the Administrative Law

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

Judge's decision be affirmed. (*Id.*) The Court has taken the matter under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On October 31, 2013, Plaintiff filed an application for SSI.[2] (Administrative Record ("AR") 10, 78, 161-82.) Plaintiff alleged disability commencing on December 5, 2010 due to cervical cancer, COPD, scoliosis, hypertension, asthma, difficulty of swallowing, and vaginal hernia.[3] (AR 162.) After the Commissioner denied Plaintiff's application initially (AR 78) and upon reconsideration (AR 97), Plaintiff requested a hearing (AR 112).

At a hearing held on September 14, 2016, at which Plaintiff appeared with an attorney representative, an Administrative Law Judge ("ALJ") heard testimony from Plaintiff and a vocational expert ("VE"). (AR 29-53.) On October 12, 2016, the ALJ issued an unfavorable decision denying Plaintiff's application for SSI. (AR 12-24.) On November 14, 2017, the Appeals Council denied Plaintiff's request for review. (AR 3-7.)

## SUMMARY OF ADMINISTRATIVE DECISION

Applying the five-step sequential evaluation process, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her application date of October 31, 2013. (AR 14; 20 C.F.R. § 416.971.) At step two, the ALJ found that Plaintiff had severe impairments consisting of obesity and degenerative disc disease of the lumbar spine

---

[2] Plaintiff was 54 years old on the application date and thus met the agency's definition of a person closely approaching advanced age. *See* 20 C.F.R. § 416.963(d). (*See* AR 59.)
  Plaintiff also applied for Disability Insurance Benefits ("DIB"), but at the initial review and reconsideration stages of her application, she is only listed as having applied for SSI. (AR 154-58, 78, 97.) The ALJ and Plaintiff's counsel also only refer to her application for SSI. (AR 12-24; Joint Stip. at 2.)
[3] Although mental impairments were not listed here, Plaintiff included medications for depression in her medication list and a Consultative Examiner examined Plaintiff for mental impairments prior to the initial review of Plaintiff's application for SSI. (AR 68, 205.)

but that her seizures, abdominal issues, asthma, COPD, history of cervical cancer, and mental impairment of depression were non-severe. (AR 14-19.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairments listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926). (AR 19.) The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work "except frequently bending, kneeling, stooping, crawling and crouching; and climbing ladders, walking on uneven terrain and working at heights frequently." (AR 19.) The vocational expert ("VE") classified Plaintiff's past work as a home attendant. (AR 52.) At step four, the ALJ found, based on the Dictionary of Occupational Titles ("DOT"), that Plaintiff could perform her past relevant work as a home attendant. (AR 23.) The ALJ did not reach step five. Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 23-24.)

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citation omitted).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports

and the evidence that detracts from the Commissioner's conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation omitted); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citation omitted).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted). However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)). The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or that, despite the legal error, 'the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (citations omitted).

## DISCUSSION

The parties raise one issue: whether the ALJ erred in finding Plaintiff did not have any severe mental impairments. (Joint Stip. at 4.) For the reasons discussed below, the Court concludes that this issue warrants reversal of the ALJ's decision.

**I.     The ALJ Erred in Finding Plaintiff's Mental Impairments Were Non-Severe**

    **A.     Facts**

Plaintiff reported that she last worked in 2005 from July through December as a caregiver to her mother. (AR 194-95.) Plaintiff also reported that she last worked on

December 5, 2010 as a caregiver to her mother. (AR 203.) December 5, 2010 is her alleged onset date of disability because of her conditions. (AR 203; AR 162.) Plaintiff's earnings records show income from self-employment in 2005 and non-covered earnings of less than one thousand dollars labeled "IHSS Recipients" in 2009, but no income in 2010. (AR 184-88.) When specifically questioned by the ALJ about her work in 2005, Plaintiff testified she was working as a caregiver "for my mother and she passed." (AR 33-34.) However, Plaintiff also testified her mother passed away in 2010. (AR 35; *see also* 365.) Plaintiff reported being fired or laid off from her job as a caregiver because of problems getting along with other people. (AR 217.) Her explanation of this occurrence was "ratial slurr." (AR 217 (errors in original).)

Plaintiff said she is five feet four and a half inches tall and weighs 280 pounds. (AR 35.) She said a normal weight for her is 165 pounds, but she started putting on weight when she got sick after her mother died.[4] (AR 35.) Plaintiff testified her emotional problems began on December 5, 2010, after her mom passed away. (AR 35-36.) She said she "just collapsed and things started going downhill." (AR 36.) She said she got past the "grieving and emotional type problems" but she still has "emotional type problems." (AR 36.) She said she was "seeing a Dr. Yama [phonetic]" for treatment. (AR 36.) That appears to be the extent of the testimony concerning her depression.[5] She also testified she does not sleep well. (AR 47.) When asked what keeps her awake at night, she answered: "I walk the floors. I check on my animals and I walk the floors, make sure they happy. I love animals." (AR 47 (error in original).) She also testified about her other medical conditions including seizures. (*See generally* AR 31-53.)

//
//

---

[4] In August 2011, she weighed 178.8 pounds. (AR 333.) In September 2012, she weighed 194 pounds. (AR 320-21.) In December 2013, she weighed 188 pounds. (AR 328.) In November 2015, she weighed 214.6 pounds. (AR 424.)
[5] Page 23 of the transcript of the ALJ Hearing is missing from the record. (*See* AR 50-51.)

5

Plaintiff listed taking medication for asthma, heart, stool softener, pain, depression, high blood pressure, and stomach ulcers. (AR 205.) She completed an Adult Function Report on December 26, 2013 and reported that she lives in a trailer by herself. (AR 211-218.) She later testified she lives in a home with two other people. (AR 32-33.) She wrote that her daily activities include watching television for an hour, eating but she rarely has an appetite, seeing her pets, but mostly staying in her room all day. (AR 211.) She states she does not go out alone because she has had black-outs and seizures, so she feels safer if someone is with her. (AR 214.) She reports that she is able to pay bills, handle a savings account, count change, and use a checkbook and money orders. (AR 214.) However, she also indicated that her ability to handle money has changed in that she loses or misplaces money frequently. (AR 215.) For social activities, she states she mostly stays home but she is "open" to others visiting her and her children and grandchildren come see her every other weekend and on holidays. (AR 215-16.) She reported she was prescribed a walker in 2010. (AR 217.) She reported taking medications for pain which cause dizziness as a side effect. (AR 220.) A month later, she reported her pain medications also cause drowsiness, nausea, anxiety, panic, fear, and hallucinations. (AR 225.)

On a questionnaire dated July 23, 2014, she reported having seizures that started seven years ago, occur randomly, and last approximately forty-five minutes. (AR 243-45.) She reported her last three seizures occurred two months, three and half months, and five months prior. (AR 243.) However, she reported she had only been on medication for seizures, levetiracetam, for three months. (AR 244.) She testified her doctor did not believe her until other people started witnessing her seizures and taking her to the hospital. (AR 40-41.)

On December 24, 2014, Plaintiff completed another Adult Function Report. (AR 261-68.) In describing her daily activities, Plaintiff wrote: "Argue with everyone because I hear them whispering plotting on me. And feed my dogs & play with them because they are the only ones who love me and don't whisper about me." (AR 261 (errors in original).) When

6

asked if her conditions affect her sleep, she said: "I am afraid the demons will kill me in my sleep." (AR 262.) She wrote she does not do yard work because: "I'm afraid of outdoors in case of fire or getting hit or robbed or bears or bobcats." (AR 264.) In relation to social changes resulting from her conditions, she stated: "I don't know they just started hating and plotting to hurt me." (AR 266.)

Plaintiff's record includes medical records from Dr. I-Hsiung Chen, M.D. dated between August 27, 2011 and December 18, 2013. (AR 327-54.) Her chronic problems include: angina, lumbago, COPD [chronic obstructive pulmonary disease], esophageal reflux, gouty arthropathy, hypertension, depressive disorder other, and neurogenic bladder other. (AR 328.) Her past medical and surgical history include: angina, cervical cancer, COPD, depression, abdominal hernia surgery repair in 2013, hypertension, and migraine headaches. (AR 328.) Her active medication list as of December 18, 2013 included Trazodone and Lexapro.[6] (AR 331.)

Plaintiff was admitted to the Hemet Valley Medical Center on August 25, 2011 for a syncopal episode. (AR 332.) She was discharged the same day. (AR 335.) Dr. Chen was copied on the medical report. (AR 332-36.) Dr. Chen referred Plaintiff to Dr. Ashok Agarwal, M.D., F.A.C.C.[7], for a consultation on dizziness following her syncopal episode in August. (*See* AR 344-45.) Dr. Agarwal noted a history of depression. (AR 344.)

On February 27, 2014, Board Certified Internal Medicine Doctor Robert Nguyen completed an internal medicine consultative examination of Plaintiff. (AR 357-63.) Dr. Nguyen noted Plaintiff had a seizure episode a few days prior to her consultative examination that resulted in her being taken to the Emergency Room. (AR 358.) Plaintiff

---

[6] Trazadone treats major depressive disorder. *See* https://www.drugs.com/trazodone.html (last visited April 10, 2019). Lexapro treats anxiety and major depressive disorder. *See* https://www.drugs.com/lexapro.html (last visited April 10, 2019).
[7] Fellow, American College of Cardiology. (AR 345.)

7

fell during the seizure, causing some swelling and a slight limp in her left leg. (AR 358, 360.) Dr. Nguyen also noted a history of depression. (AR 358.)

### B. Consultative Examining Psychiatrist's Medical Opinion

On April 7, 2014, Dr. Oluwafemi Adeyemo, M.D., performed a consultative psychiatric examination of Plaintiff. (AR 364-67.) Plaintiff reported a ten-year history of depression and that her treatment had been with her primary care physician, Dr. I. Chen. (AR 364.) She said, "I hear voices all the time. I hear demons. I hear someone calling my name and when I look, there is nobody there. I see shadows. I see people coming towards me. I fear that people will hurt me." (AR 364.) Dr. Adeyemo characterized Plaintiff's symptoms to include "depressed mood, irritability, social isolation, poor energy, poor appetite, weight loss, anhedonia and excessive sleep" along with "auditory hallucinations, visual hallucinations and paranoid delusions." (AR 364.) Plaintiff's current medications were noted to be Sertraline, Zolpidem, Alprazolam, and Abilify. (AR 365.) Plaintiff said she completed high school and was in special education classes. (AR 365.) Her work history included that she was a caregiver to her mother and her aunt for eight years. (AR 365.) Plaintiff reported using crack cocaine for fifteen years and that she had last used in 1977.[8] (AR 365.) Plaintiff identified the death of her mother in 2010 to be her main stressor. (AR 365.)

Dr. Adeyemo observed Plaintiff to be "casually groomed… alert and oriented to self, place and partly to date."[9] (AR 366.) Her speech was normal, she denied suicidal or homicidal thoughts, her immediate recall was three out of three, her recall after five minutes was zero out of three "even with prompting," and her insight and judgment were fair. (AR 366.) Dr. Adeyemo wrote Plaintiff "was noted to be depressed with mood congruent affect."

---

[8] Plaintiff was eighteen years old in 1977. (*See* AR 364.)
[9] Plaintiff said the date was April 6, 2012 when it was really April 7, 2014. (AR 366.)

8

(AR 366.) Plaintiff's "BDI II score was 35 which is reflective of clinically significant depressive symptoms." (AR 364.)

Dr. Adeyemo diagnosed Plaintiff with Schizoaffective Disorder (Depressive Type), Rule Out Major Depressive Disorder, Recurrent, Severe with Psychotic Features, and Rule Out Schizophrenia (Paranoid Type). (AR 366.) Dr. Adeyemo also found Plaintiff had Cluster A Personality Traits and a GAF score of 58.[10] (AR 366.) Dr. Adeyemo identified financial constraints, the death of her mother, and multiple medical problems to be problems affecting Plaintiff's diagnosis but found Plaintiff was capable of managing her finances. (AR 366.) Dr. Adeyemo found Plaintiff would have moderate limitations in daily activities, social functioning, concentration, persistence, pace, responding appropriately to co-workers and supervisors, responding appropriately to the public, responding appropriately to work situations including attendance and safety issues, and dealing with changes in a routine work setting. (AR 367.) Plaintiff would have mild to moderate limitations retaining and executing simple instructions consistently. (AR 367.) Dr. Adeyemo did not observe bizarre behavior from Plaintiff during the evaluation. (AR 367.)

//
//
//
//

---

[10] "GAF" refers to Global Assessment of Functioning. *See Diagnostic and Statistical Manual of Mental Disorders*, 4th ed. ("DSM IV"). A score of 51 to 60 signifies "moderate" symptoms, such as flat affect or occasional panic attacks, or moderate difficulty in social, occupational, or school functioning, such as having few friends or conflicts with peers or co-workers. *Id.* A score in the range of 61 through 70 denotes some "mild" symptoms, such as depressed mood or mild insomnia, or some difficulty in social, occupational, or school functioning, such as occasional truancy or theft within the household, but indicate that the subject is generally functioning pretty well and has some meaningful interpersonal relationships. *Id.* GAF scores have been described as a "rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert,* 159 F.3d 1161, 1164 n. 2 (9th Cir. 1998) (citation omitted). However, pursuant to Agency regulations, the GAF scale has no "direct correlation to the severity of requirements in Social Security Administration mental disorder listings." *See* 65 Fed. Reg. 50746, 50764-6. "The DSM V no longer recommends using GAF scores to measure mental health disorders because of their 'conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" *Olsen v. Comm'r Soc. Sec. Admin.*, 2016 WL 4770038, at *4 (D. Or. Sept. 12, 2016) (quoting DSM-V, 16 (5th ed. 2013)).

## C. State Agency Doctors' Psychiatric Medical Opinions

Dr. Cal VanderPlate, Ph.D., ABPP, reviewed Plaintiff's application at the initial level on April 25, 2014. (AR 59-77.) Dr. VanderPlate diagnosed Plaintiff with severe affective disorder. (AR 69.) He did not find Plaintiff's allegations of hallucinations to be credible or schizophrenia to be supported by Plaintiff's medical history, but he otherwise gave great weight to Dr. Adeyemo's opinion. (AR 69.) He opined Plaintiff's RFC included moderate limitations in understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods of time, completing a normal workday and workweek without interruptions and performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the public, and accepting instructions and responding appropriately to criticism from supervisors. (AR 73-74.) He found Plaintiff was otherwise not significantly limited. (AR 73-74.)

Dr. Rosalia Pereyra, Psy.D., reviewed Plaintiff's application at the reconsideration level on October 7, 2014. (AR 79-96.) Dr. Pereyra also diagnosed Plaintiff with severe affective disorder. (AR 88.) Her assessment of Plaintiff's mental impairments and RFC was largely the same as Dr. VanderPlate's. (AR 92-94.)

## D. Applicable Law

The Commissioner defines a severe impairment as "[a]n impairment or combination of impairments . . . [that] significantly limit[s] your physical or mental ability to do basic work activities," including, *inter alia*: "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." 20 C.F.R. § 416.921. "An impairment or combination of impairments may be found not severe only if the

evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (citations omitted). Plaintiff bears the burden of proof at step two. *See Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citation omitted). If "an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step." *Id.* at 687 (citation omitted). "Step two, then, is a *de minimis* screening device [used] to dispose of groundless claims, and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is clearly established by medical evidence." *Id.* (emphasis added) (citations omitted).

Finally, an ALJ is required to consider all of the limitations imposed by a claimant's limitations, even those that are not severe. *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1164 (9th Cir. 2008). "Even though a non-severe 'impairment standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim.'" *Id.* (quoting Social Security Ruling 96–8p (1996)).

### E.  Analysis

After summarizing Plaintiff's medical record, the ALJ found Plaintiff's mental impairments were non-severe. (AR 17.) The ALJ gave little weight to the psychiatric CE and state agency doctor medical opinions. (AR 17-19.)

There are three categories of physicians: treating physicians, examining physicians, and nonexamining physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); *see* 20

C.F.R. 416.927.[11] Treating physician opinions should be given more weight than examining or nonexamining physician opinions. *Orn*, 495 F.3d at 632. This is because a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). If the treating physician's opinion is not contradicted by another doctor, it may be rejected only if the ALJ provides "clear and convincing reasons supported by substantial evidence in the record." *Orn*, 495 F.3d at 632. If the treating physician's opinion is contradicted by another doctor, it may be rejected only by "specific and legitimate reasons supported by substantial evidence in the record." *Id.* Similarly, an ALJ must satisfy the clear and convincing reasons standard to reject an uncontradicted examining physician's opinion or satisfy the specific and legitimate reasons standard to reject a contradicted examining physician's opinion. *Carmickle*, 533 F.3d at 1164.

All three of the physicians that provided psychiatric medical opinions in this case agree that Plaintiff has a mental impairment that is severe. (AR 59-77, 79-96, 364-67.) Because none of the opinions contradict each other concerning whether Plaintiff's mental impairment is severe, the ALJ needed to provided clear and convincing reasons to reject this opinion. *Id.*

The ALJ rejected Dr. Adeyemo's medical opinion because it was based on Plaintiff's "self-reported symptoms," was not consistent with the mental status examination, was not consistent with Plaintiff's medical record treatment notes, and was based on one examination. (AR 17-18.) The ALJ also rejected Dr. Adeyemo's findings concerning Plaintiff's BDI II score because it was based on "self-reported symptoms" and Plaintiff's

---

[11] Effective March 27, 2017, the Social Security Administration revised its regulations directing the evaluation of medical opinion evidence, including 20 C.F.R § 416.927. But these revisions are not applicable or relevant to the analysis here relating to Plaintiff's October 31, 2013 application for SSI benefits.

12

GAF score because it only serves as a "snapshot" of Plaintiff's behavioral status but not a functional capacity analysis. (AR 17-18.)

The ALJ's first reason for rejecting Dr. Adeyemo's medical opinion was that it relied too heavily on Plaintiff's subjective complaints. (AR 17.) An ALJ may reject a medical opinion if it is "based to a large extent on [a plaintiff's] self-reports" rather than clinical evidence and the ALJ also rejects the plaintiff's credibility. *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (citation omitted). "[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199-2000 (9th Cir. 2008) (citation omitted). Medical opinions and diagnoses based on clinical observations are acceptable forms of evidence that can show mental disability. *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987); *Bilby v. Schweiker*, 762 F.2d 716, 719 (9th Cir. 1985). Dr. Adeyemo included Plaintiff's statements in the CE report but did not include any indication that Plaintiff lied about her symptoms or that there was reason to question her veracity. Dr. Adeyemo observed Plaintiff in a clinical setting, conducted a mental status examination, and utilized mental health assessment tools, namely the BDI II and GAF score. Dr. Adeyemo did not state or indicate that Plaintiff's diagnosis was based more heavily on Plaintiff's statements than on clinical observations. The ALJ does not support his finding that Dr. Adeyemo's opinion is primarily based on Plaintiff's statements and substantial evidence does not support it either.[12] Thus, this is not a clear and convincing reason to reject the examining physician's medical opinion.

The second reason the ALJ gave for rejecting Dr. Adeyemo's medical opinion was that it was inconsistent with Dr. Adeyemo's mental status examination of Plaintiff. (AR 17-18.)

---

[12] To the extent the ALJ rejects Dr. Adeyemo's medical opinion because he rejects Plaintiff's BDI II score, the same reasoning applies.

13

> To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim. The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.

*Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). The ALJ listed the findings included in Dr. Adeyemo's mental status examination of Plaintiff but he provides no explanation or interpretation to support his conclusion that Dr. Adeyemo's diagnosis is inconsistent with the mental status examination. (AR 17-18.) Accordingly, this is not a clear and convincing reason to reject the doctor's medical opinion.

The ALJ's third reason for rejecting Dr. Adeyemo's medical opinion was that it was inconsistent with Plaintiff's treatment notes. (AR 18.) The ALJ then cited to five medical records in which Plaintiff was noted to have a normal mood, some noted no suicidal or homicidal ideations, and one noted no hallucinations. (AR 18.) But as Plaintiff points out, these records are Emergency Room records. (Joint Stip. at 8; AR 18, 375-419.) These records reflect Plaintiff seeking treatment for dizziness and bruising on her belly, abdominal pain, medication refills, and ear pain. (AR 376-78, 381-83, 389-91, 393-95, 397-99.) What the ALJ did not mention is that all five records reflect Plaintiff's medications included Escitalopram and Trazodone, medications that treat depression.[13] (*See id.*) Because Plaintiff was not seeking mental health treatment in these instances but was on medications for mental health, these records do not provide an accurate picture of the severity of Plaintiff's mental

---

[13] Escitalopram, the generic name for Lexapro, treats anxiety and major depressive disorder. *See* https://www.drugs.com/escitalopram.html (last visited April 10, 2019). Trazodone treats major depressive disorder. *See* https://www.drugs.com/trazodone.html (last visited April 10, 2019).

health impairment. The ALJ then characterized Plaintiff's mental health treatment to be essentially nonexistent:

> The only treatment for the claimant's mental issues is the claimant's psychiatric consultative examination…. The claimant has not produced any mental health treatment records. Although the claimant reports that she has been treated for depression by her primary care physician for the past 10 years, the claimant's medical records do not establish much, if any specific, treatment for depression.

(AR 17-18.) Plaintiff's primary physician medical records reflect she has chronic depressive disorder and prescriptions for depression medication (AR 328, 331), but depression is only noted a few times (AR 332, 344, 350; *see generally* AR 327-54). While the ALJ is correct that Plaintiff's treatment records are sparse, they nonetheless show she was diagnosed with a depressive disorder and that she was treated with a number of prescription medications specifically to treat depression. Therefore, Dr. Adeyemo's diagnosis of a severe mental impairment is not inconsistent with Plaintiff's treatment records and this is not a clear and convincing reason to reject the medical opinion.

The fourth reason the ALJ relied on, that Dr. Adeyemo only examined Plaintiff once, is not a clear and convincing reason to reject an examining physician's medical opinion. Unless a treating physician's medical opinion is given controlling weight, all medical opinions are weighed according to six factors. 20 C.F.R. § 416.927(c). The factors are: (1) has the source examined Plaintiff; (2) the length, frequency, nature, and extent of the treatment relationship; (3) how well is the opinion supported by relevant evidence; (4) how consistent is the opinion with the record; (5) is the source a specialist; and (6) any other factors. 20 C.F.R. § 416.927(c)(1)-(6). Consultative examinations are sought and paid for by the Social Security Administration ("SSA"). 20 C.F.R. § 416.919. To reject a CE's

medical opinion because the SSA only requested and paid the CE to examine a plaintiff once would be contrary to the factors used to weigh medical opinions and contrary to the SSA's use of consultative examinations generally.[14] The fact that Dr. Adeyemo examined Plaintiff once is only one factor to consider. Other factors that weigh in favor of accepting Dr. Adeyemo's medical opinion include that Dr. Adeyemo did examine Plaintiff, administered health assessment tools the results of which were consistent with a severe mental impairment[15], the medical opinion was consistent with Plaintiff's primary care physician's diagnosis of a mental impairment and prescriptions for depression medication, and Dr. Adeyemo is a specialist. (*See* AR 364-67; 20 C.F.R. § 416.927(c)(1)-(6).) Accordingly, the fact that Dr. Adeyemo, a consultative examiner, only examined Plaintiff once is not a clear and convincing reason to reject the doctor's opinion.

None of the reasons relied on by the ALJ satisfy the clear and convincing standard for rejecting the uncontradicted opinion of the examining physician. Because there are three doctors who agree that Plaintiff has a severe mental impairment and none of the ALJ's reasons for rejecting the examining physician's opinion are legally sufficient, Plaintiff has provided sufficient evidence to satisfy Step Two's *de minimis* standard for establishing a severe impairment. *See Webb*, 433 F.3d at 687 (citation omitted). It was therefore legal error for the ALJ to find Plaintiff not disabled based on the determination of no severe mental impairment at Step Two. The error was not harmless because it affects the ultimate question of disability. *Brown-Hunter*, 806 F.3d at 494. Accordingly, remand is warranted

---

[14] It would also, by logical extension, create problems with the legitimacy of the SSA using non-examining physicians, which is the case at the initial and reconsideration levels of a disability application as well as during ALJ hearings when medical experts are called to testify. It is worth noting that the ALJ in this case did not rely on the fact that the state agency physicians at the initial and reconsideration levels never examined Plaintiff when he rejected their medical opinions as to the severity of her mental impairments. (*See* AR 18.)

[15] The ALJ's rejection of Dr. Adeyemo's assessment of Plaintiff's GAF score is not a clear and convincing reason to reject the opinion overall either. While the GAF score is not binding on the ALJ (*see* 65 Fed. Reg. 50746, 50764-6), the rejection of it simply because it is a "snapshot" does not undermine Dr. Adeyemo's medical opinion. *See Bilby*, 762 F.2d at 719 ("[D]isability may be proved by medically-acceptable clinical diagnoses, as well as by objective laboratory findings." (quoting *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975))).

and the ALJ is directed to continue the sequential analysis of whether Plaintiff is disabled. *See Webb*, 433 F.3d at 688 (citation omitted).

## CONCLUSION

Accordingly, for the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED AND REMANDED for further administrative proceedings consistent with this Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and counsel for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATE: April 10, 2019

/s/ Karen L. Stevenson
KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE